UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
     v.                            )     Cr. No. 05-CR-10037-GAO
                                   )
GRANT BOYD                         )
                                   )
     Defendant.                    )

### Supplemental Memorandum to Note
### Reversal of Case Cited by Defendant

The defendant cited the opinion of "brother bench officer" Gertner (Mem. at 7) in <u>United States v. Dessesaure</u>, 314 F. Supp. 2d 81, 82-83 (D. Mass. 2004), granting a suppression motion. <u>Id</u>. The First Circuit has reversed Judge Gertner's decision and has upheld the validity of the search warrant at issue in the case. <u>United States v. Dessesaure</u>, No. 04-2170 (1st Cir., Nov. 30, 2005), attached.

                         Very truly yours,
                         MICHAEL J. SULLIVAN
                         United States Attorney

              By:  /s/Nancy Rue
                         NANCY RUE
                         Assistant U.S. Attorney

# United States Court of Appeals
## For the First Circuit

No. 04-2170

UNITED STATES OF AMERICA,

Appellant,

v.

EARL DESSESAURE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell and Cyr, Senior Circuit Judges.

Robert E. Richardson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Cynthia A. Young, Assistant United States Attorney, were on brief, for appellant.
Steven L. Winniman for appellee.

November 30, 2005

**LYNCH**, **Circuit Judge**.    The prosecution takes this interlocutory appeal, under 18 U.S.C. § 3731, from the district court's partial allowance of the defendant's motion to suppress evidence and denial of the prosecution's motion for reconsideration.  United States v. Dessesaure (Dessesaure I), 314 F. Supp. 2d 81 (D. Mass. 2004); United States v. Dessesaure (Dessesaure II), 323 F. Supp. 2d 211 (D. Mass. 2004).

In sum, the district court suppressed evidence seized from Earl Dessesaure's apartment (consisting of heroin, drug paraphernalia, a gun, and bullets) pursuant to a warrant because the warrant affidavit contained information that the police observed when they earlier illegally entered the apartment to "freeze" it and because of material misstatements in that affidavit.  Accepting as accurate these factual conclusions, we nonetheless disagree with the trial court's ultimate conclusion that suppression was required.  Rather, we find that, even after striking the offending material from the warrant, there was adequate basis for a probable cause determination and the officers would have sought a warrant regardless.  We reverse.

**I.**

For our purposes, a greatly streamlined version of the facts taken from the suppression hearing, geared to the issues described above, is all that is necessary.

-2-

The investigation of Dessesaure began when Officer John Broderick, Jr. received information from "different sources" that Dessesaure was selling heroin out of a maroon Cadillac Escalade with a particular license plate.[1] Dessesaure I, 314 F. Supp. 2d at 83. The license plate number given by the sources matched that of a maroon Cadillac Escalade registered to Dessesaure at an address in Quincy, Massachusetts.

In the early hours of February 24, 2003, police began surveillance on the Quincy apartment. Id. at 86. At 9:00 a.m., Officer Paul Quinn observed Dessesaure leave the Quincy apartment and throw a trash bag in a dumpster before he drove off. Id. Quinn recovered the trash bag and found a "residue of an unknown powder substance" and a utility bill with Dessesaure's name and the address of the Quincy apartment. The residue was not field tested to confirm that it was heroin. Id. Officers followed Dessesaure in his Escalade to a home in Boston's Dorchester neighborhood and saw Dessesaure enter, carrying a black shoulder bag. Id. He

---

[1] Broderick testified at the suppression hearing about the information he received from these sources. The district court described Broderick's testimony about the sources as "sloppy, inconsistent, and worse, not credible." Dessesaure I, 314 F. Supp. 2d at 84. In particular, the court focused on the fact that Broderick had discarded his notes about the statements made by the sources and the lack of other evidence supporting the credibility of the sources. Id. at 84-86. Nonetheless, the court concluded that this "vague information from sources without any description of their basis of knowledge" could be considered when evaluating whether the information in the warrant affidavit could establish probable cause. Id. at 94.

emerged two minutes later, as did his girlfriend, Tina Tate.  Id.
at 86-87.  The police followed Dessesaure to Brigham and Women's
Hospital, where Tate went in and returned ten minutes later.  Id.
at 87.  The police then lost surveillance for some time.  When they
reestablished contact with the car again at approximately 11:15
a.m., Dessesaure and Tate were returning to Quincy.  Id.
Dessesaure made a number of evasive maneuvers as he drove and did
not take the most direct route back to the Quincy apartment.  Id.
Officer Broderick testified that such driving is often employed by
drug traffickers to see if they are being followed by law
enforcement officers.[2]  Id.

Dessesaure and Tate returned to the Quincy apartment.
Approximately 20 minutes later, Dessesaure left alone and drove
into Boston, followed by the officers.  Id.  Once in Boston,
Dessesaure pulled his Escalade over on a street in the South End
and picked up a man, Nelson Boyd.  Dessesaure drove Boyd for a few
blocks and stopped.  Id.  Boyd got out of the car and Dessesaure
drove away.  Police officers, including Broderick, stopped Boyd and
searched him, recovering a plastic bag they supposed, based on
their experience, contained heroin.  Id.  Boyd lied, telling

_____

[2]  In Dessesaure I, the district court found that this
conclusion "made no sense."  314 F. Supp. 2d at 87.  In Dessesaure
II, however, it amended this finding "to reflect the fact that
Dessesaure may well have been driving erratically even while going
on a routine errand with his girlfriend." 323 F. Supp. 2d at 217
n.11.

-4-

officers that he had never even been in the Escalade.  As to
whether Boyd acquired the heroin while in Dessesaure's car, Officer
Juan Seoane, who, along with Broderick, had been following
Dessesaure before Dessesaure picked up Boyd, testified that Boyd
did not appear to be carrying anything when he entered the vehicle.
Id.  However, Seoane also testified that he could not see an
exchange being made while Boyd was in the Escalade.  The district
court noted that "the bag was small and would not necessarily have
been apparent to the surveilling officers."  Id.

        While Broderick remained behind with Boyd, other
officers, including Officer Seoane, continued to follow the
Escalade.  Dessesaure drove erratically after dropping Boyd off.
Id.  Seoane testified that, based on his experience, Dessesaure's
driving was consistent with that of drug dealers who, after
conducting a drug sale, attempt to make sure that they are not
being followed.  Id.  Once the officers following Dessesaure were
informed that heroin had been found on Boyd, they pulled over the
Escalade.  While the officers obtained no contraband from a pat-
frisk of Dessesaure and a search of the car, Seoane noted that
Dessesaure's pants zipper was open and his shirt was pulled out
through his fly.  Id.  Seoane testified that in his experience, it
was common for a drug dealer to hide his wares in his rectum to
avoid detection.  Id. at 87-88.  The implication was that
Dessesaure had put drugs in his rectum at home and just had

retrieved a bag to sell to Boyd.  Dessesaure was arrested on the street by Officer Seoane.  Id.

Officers took Dessesaure to the station house to be booked; Seoane followed them in Dessesaure's car.  Broderick arrived a short time later.  Broderick questioned Dessesaure at the booking desk.  Both Broderick and Dessesaure testified that Broderick told Dessesaure he was going to get a warrant to search the Quincy apartment.  When Broderick asked Dessesaure where he lived, Dessesaure replied that he lived in Roxbury.  That was not true; he lived in Quincy.  Broderick testified that he warned Dessesaure at the booking desk that if heroin was found in his apartment, his girlfriend could be charged.  Broderick stated that Dessesaure then informed him of the location of the heroin in the Quincy apartment, with the hope that his girlfriend would not be charged.  Id. at 89.  Dessesaure denied ever making these statements.  The district court noted that Broderick could not satisfactorily explain why these statements were not recorded in any way, and thus gave "no credit to Broderick's claims that defendant made statements about drugs in his apartment."[3]  Id.

---

[3] In Dessesaure I, the district court found that there was an inconsistency between Broderick's statement that he told Dessesaure his girlfriend could be charged and his earlier testimony that he did not believe the girlfriend was involved.  314 F. Supp. 2d at 89 & n.11.  In Dessesaure II, the district court modified this finding, stating that the issue of "[w]hether Broderick believed Dessesaure's girlfriend was an 'active participant' in drug dealing or not a participant at all" was immaterial.  323 F. Supp. 2d at 215.

After questioning Dessesaure, Broderick and other officers took Dessesaure's keys and proceeded to the Quincy apartment for the purpose of "freezing" it on Broderick's way to get a warrant.  <u>Id.</u> The goal of a "freeze," it seems, is to secure a location to prevent its occupants from destroying evidence while a search warrant is being obtained.

From the record, the government suggests to us and the district court that Broderick thought he could enter the apartment to "freeze it" absent exigent circumstances based on vague and broad language in a state court opinion. <u>See</u> <u>Dessesaure II</u>, 323 F. Supp. 2d at 216 & n.10 (discussing <u>Commonwealth</u> v. <u>Alvarez</u>, 661 N.E.2d 1293 (Mass. 1996)).  The testimony of the officers at the suppression hearing, however, dealt more with whether there were exigent circumstances justifying the pre-warrant entry.

Broderick testified that at the station house Seoane told him that as Dessesaure was being arrested, Dessesaure had yelled something to the gathering crowd about calling "his peeps." <u>Dessesaure I</u>, 314 F. Supp. 2d at 88.  Broderick took this statement to be an attempt by Dessesaure to communicate the fact of his arrest to people who might be in a position to destroy evidence; he testified that he believed Dessesaure's statement created exigent circumstances necessitating a "freeze" of Dessesaure's apartment. <u>Id.</u> at 88.  The district court did not believe Broderick, finding

that he had "fabricated [Dessesaure's] alleged statement."[4]    Id.
Seoane testified that at the station house, he witnessed Dessesaure
sign a written waiver of his Miranda rights.    The government,
however, was unable to produce the signed waiver, leading the
district court to the "inevitable conclusion that [the waiver]
simply never existed."  Id. at 89 n.12.

    At the station house, Seone followed up on his earlier
observation of Dessesaure's open pants zipper by conducting a strip
search of Dessesaure.    Id. at 88.  He found that Dessesaure had
secreted a plastic bag containing six smaller plastic bags of
heroin in his rectum.    Seoane also found sixty dollars in
Dessesaure's shirt pocket.    Id.  Seoane testified that Dessesaure
later told him he was selling bags of heroin for sixty dollars, but
the district court noted that "[t]his statement was not recorded in
any police document."  Id. at 88-89.

    In the meantime, Broderick and the officers used
Dessesaure's keys to enter the Quincy apartment and found Tina Tate

---

    [4] In Dessesaure I, the court found that this fabrication came
"when [Broderick] knew the warrantless entry was being challenged
and he needed to come up with some exigency to justify it."  314 F.
Supp. 2d at 88.  In Dessesaure II, however, the court modified this
finding, and held that "the record is not clear about what Officer
Broderick specifically knew or did not know of the Court's concerns
at the moment he took the stand, or whether he gleaned that concern
from his questioning at the hearing or from his pre-trial
preparation, or was just 'gilding the lily,' as they say, on his
own."  323 F. Supp. 2d at 214.    Nonetheless, the court still
concluded that "what Broderick reported Dessesaure had said at his
arrest was not true."  Id.

inside.  Id. at 89.  The officers detained Tate and made a number
of observations which were used shortly thereafter in the warrant
affidavit.   The items  observed and  recited in  the  affidavit
included "sixteen (16) 'bundles' of glassine bags, five (5) loose
glassine bags, a large plastic bag containing a powder believed to
be Heroin, a digital scale, a roll of tape, a box containing
hundreds of empty glassine bags, a bag of small black elastics, a
ceramic plate with two plastic [transit] passes."   Broderick
testified that he then telephoned back to the station house, where
Dessesaure was  being  detained,  and  informed Seoane  what  the
officers had found in Dessesaure's apartment.  Id. at 90.  Seoane
testified that when he informed Dessesaure what was found during
the "freeze" of the apartment, Dessesaure gave him additional
information about the drugs.  Id.  The district court disbelieved
Seoane's testimony on this point.  Id. ("I do not find Seoane's
account of Dessesaure's statements credible.").

     After five to ten minutes in Dessesaure's apartment,
Broderick went to the District Attorney's office to prepare a
warrant affidavit and to apply for a search warrant, as he had
earlier said that he would, leaving behind other officers at the
apartment to maintain the freeze.   In the warrant affidavit,
Broderick included the following: (1) information he received from
his  sources  before  the  police  began  surveillance;  (2)  the
registration information of the Escalade showing that it belonged

to Dessesaure and was registered at the Quincy address; (3) a description of the February 24th surveillance of Dessesaure, as related above; (4) the fact that Dessesaure had concealed bags of heroin in his body; (5) the statements Dessesaure purportedly made at the station regarding the location of heroin in the Quincy apartment, both before and after the freeze; and (6) the items observed in plain view at the apartment during the freeze. Id. The magistrate granted the warrant application. During the search pursuant to this warrant, officers seized a gun, bullets, more drugs and drug paraphernalia, money, and documents, in addition to the items which been observed during the pre-warrant search. Id.

Dessesaure challenged his arrest as being without probable cause and sought to suppress evidence from the time of the arrest, from his person while he was at the station house, and from his apartment. The district court found that, while it was "a close case," there was probable cause for Dessesaure's arrest on the street. Id. at 91. The search at the station house was, as a result, also justified as a search incident to a lawful arrest. Id. Nonetheless, the district court granted Dessesaure's motion to suppress the evidence found in his apartment on the grounds that there was no exigency that would justify a warrantless entry and that any testimony by Broderick suggesting exigent circumstances was not credible. Id. The district court found that absent

exigency, the pre-warrant entry into the apartment constituted a violation of the Fourth Amendment.  Id. at 92-93.

The district court further found that the warrant affidavit used tainted information, that is, (1) the observations made pursuant to the illegal pre-warrant entry, and (2) Broderick and Seoane's testimony as to statements made by Dessesaure while in custody regarding the location of heroin in his apartment, which the court had found to be fabricated.  Id. at 93-94.  The district court concluded that the remaining untainted evidence "[did] not suffice to create probable cause to conclude that Dessesaure kept drugs in his apartment, or anywhere else besides his car" and so suppressed all the evidence found in the apartment.  Id. at 94. The government appeals only this finding as to probable cause and the suppression of the evidence from Dessesaure's apartment, leaving unchallenged the court's underlying findings regarding the legality of the warrantless entry and the falsity of the officers' testimony.[5]

## II.

We turn to whether the district court erred in suppressing the evidence seized pursuant to the search warrant. Our review is bifurcated; factual findings are examined for clear

---

[5] To summarize, the evidence from Dessesaure's home that the government argues the district court improperly suppressed includes drugs and drug paraphernalia, glassine bags and bag ties, a digital scale, a ceramic plate with two transit passes, a roll of tape, a gun, bullets, money, and documents.

error, while ultimate questions as to whether the later search under the warrant violated the Fourth Amendment are reviewed <u>de novo</u>. <u>See</u> <u>United States</u> v. <u>Weidul</u>, 325 F.3d 50, 51 (1st Cir. 2003).

The district court's analysis, as it correctly articulated, was governed by <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978), and <u>Murray</u> v. <u>United States</u>, 487 U.S. 533 (1988). Under the procedure set forth in <u>Franks</u>, a court faced with a warrant affidavit which includes deliberately or reckless false statements must set aside those false statements and determine whether the remaining information in the affidavit sets forth sufficient facts to support a finding of probable cause. <u>Franks</u>, 438 U.S. at 171-72. Although it is not explicitly tied to the "independent source" doctrine,[6] <u>Franks</u> requires an analogous inquiry: whether, ignoring the false statements, the remaining information in a warrant application is an independent source of the discovered material.

In <u>Murray</u>, police officers, after conducting an illegal search of a warehouse, obtained a search warrant for that warehouse, although the information observed during the illegal

---

[6] The independent source doctrine acts as a limitation on the exclusionary rule of the Fourth Amendment. The doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." <u>Nix</u> v. <u>Williams</u>, 467 U.S. 431, 443 (1984); <u>see also</u> <u>Wong Sun</u> v. <u>United States</u>, 371 U.S. 471, 487 (1963) ("[T]he exclusionary rule has no application [when] the Government learned of the evidence 'from an independent source' . . . ." (quoting <u>Silverthorne Lumber Co.</u> v. <u>United States</u>, 251 U.S. 385, 392 (1920))).

-12-

search was not included in the warrant affidavit.  487 U.S. at 535-36.  Murray held that the "ultimate question" was "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." 487 U.S. at 542.  The Court held that in two situations, the search would not be an independent source: (1) "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry"; and (2) "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."  Id.

Unlike in Franks, the constitutional violation in this case was not solely the inclusion of deliberate or reckless false statements in a warrant application, but also an illegal search. However, unlike in Murray, the observations made during the illegal entry were included in the warrant affidavit, making this situation ripe for a Franks analysis.

This case requires us to attempt to reconcile the Court's instructions in Franks and Murray.  Prior to Murray, this court held that, when considering a warrant that contained information obtained through an illegal search, a simple Franks analysis was appropriate.  See United States v. Veillette, 778 F.2d 899, 903-904 (1st Cir. 1985) ("[B]ales of marihuana [observed during an illegal search] should be set to one side . . . and the remaining content of the affidavit examined to determine whether there was probable

cause to search, apart from the tainted averments."). Most other circuits followed the same approach. See, e.g., United States v. Alexander, 761 F.2d 1294, 1300 (9th Cir. 1985); United States v. Antone, 753 F.2d 1301, 1307 (5th Cir. 1985); James v. United States, 418 F.2d 1150, 1151 (D.C. Cir. 1969). The question for us now is whether the Court's subsequent decision in Murray requires a different analysis in the context of observations made during an illegal search.

Murray states as a first criterion that a search pursuant to a warrant does not come from an independent source "if the agent's decision to seek the warrant was prompted by what they had seen during their initial [illegal] entry." 487 U.S. at 542. Again, there is a seeming tension between this inquiry and Franks, which only requires a determination that the affidavit still supports a finding of probable cause if the illegal information is excised. See United States v. Beltran, 917 F.2d 641, 644 (1st Cir. 1990) (noting but not resolving this tension). The cases on Murray's first prong are reconcilable, as we discuss below.

As to the second prong, read literally, the Murray statement that a search pursuant to a warrant would not be an "independent source" of the seized material "if information obtained during [the initial] entry was presented to the Magistrate and affected his decision to issue the warrant," Murray, 487 U.S. at 542, seems in considerable tension with continued use of the

_Franks_ procedure for evaluating tainted material in warrant applications. When a warrant application contains deliberate or reckless false statements, _Franks_ does not require a separate evaluation of whether the warrant magistrate's decision was "affected" by the falsehoods.

Indeed, since illegally obtained information could "affect" the decision of the magistrate without changing the ultimate decision to grant the warrant, broad application of the additional analysis suggested by _Murray_ would work against the principle that the "fruit of the poisonous tree" doctrine not be used to place the government in a worse position than it would have been in absent its illegal conduct. _See_ _Nix_ v. _Williams_, 467 U.S. 431, 443 (1984); _see also_ _United States_ v. _Jenkins_, 396 F.3d 751, 758-59 (6th Cir. 2005).

Every circuit to consider the question has held that the Court's instruction in _Murray_ to analyze whether the tainted information affected the magistrate's decision to issue the warrant did not mean to change the dominant pre-existing approach under _Franks_. _See_ _Jenkins_, 396 F.3d at 757-60 ("[A]uthority from this and other circuits, as well as the principles underlying the _Murray_ rule, support an interpretation of the independent source rule that incorporates consideration of the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information."); _United States_ v. _Markling_, 7 F.3d 1309, 1316 (7th

-15-

Cir. 1993) ("[T]here is no indication in Murray that the Court intended to reject -- or even that it was considering -- the prevailing Franks-based rule.  A rule focusing on the tainted information's actual influence on a particular magistrate would be inconsistent with Franks; yet, the Court in Murray did not cite Franks, much less attempt to reconcile Murray with Franks."); United States v. Restrepo, 966 F.2d 964, 968-70 (5th Cir. 1992) ("The relevant phrase ('affected his decision to issue the warrant'), almost certainly was simply a paraphrase -- albeit a confusing one when considered noncontextually -- of the approach long sanctioned in the circuits."); United States v. Herrold, 962 F.2d 1131, 1141 (3d Cir. 1992) ("[T]he Court's use of 'affect' in Murray must be understood to signify affect in a substantive manner." (emphasis in original)).  We agree.

Furthermore, other circuits, including this one, have implicitly adopted the same approach, applying the Franks analysis without engaging in consideration of the effect of the illegality on the magistrate's thought process as suggested by Murray.  See United States v. Ford, 22 F.3d 374, 379 (1st Cir. 1994);  United States v. Davis, 313 F.3d 1300, 1304 (11th Cir. 2002);  United States v. Halliman, 923 F.2d 873, 880-81 (D.C. Cir. 1991);  United States v. Gillenwaters, 890 F.2d 679, 681-82 (4th Cir. 1989).

We hold that the Court in Murray did not intend to add anything to the pre-existing Franks approach to evaluating warrant

applications containing tainted information when it stated that courts should ask whether such information "affected [the Magistrate's] decision to issue the warrant." Murray, 487 U.S. at 542. Thus, when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause.

There of course remains the separate question of whether the first Murray requirement -- that the police would have sought the warrant even in the absence of the tainted material -- was meant to place an additional gloss on the Franks analysis.

### III.

Two questions must be addressed here: (1) whether "the agents' decision to seek the warrant was prompted by what they had seen during their initial entry," Murray, 487 U.S. at 542, and (2) whether the affidavit contained sufficient facts to support probable cause when the offending facts were excised.[7] We address the probable cause issue first.

As to probable cause, the district court concluded that the untainted facts in the warrant application were insufficient to support probable cause for a search of the apartment. Dessesaure

_____

[7] We take it as given that the warrant affidavit contains deliberate or reckless falsehoods -- the station house statements purportedly made by Dessesaure -- and information obtained pursuant to an illegal search -- the observations of the officers during their "freeze" of Dessesaure's apartment.

<u>I</u>, 314 F. Supp. 2d at 94.  The district court framed the second question as asking whether officers would have sought the warrant if their illegal search had turned up nothing, and concluded that the officers would not have continued pursuing the warrant.  We review the conclusion that the cleansed affidavit was insufficient under the special de novo review provisions set forth in <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690 (1996).  <u>See</u> <u>United States</u> v. <u>Smith</u>, 423 F.3d 25, 31 n.4. (1st Cir. 2005) (explaining that under <u>Ornelas</u>, review of the Fourth Amendment conclusion is de novo, but deference is owed to the inferences drawn from facts found by the issuing court and by law enforcement officers).[8]    As to the

---

[8] There is a separate question of the lens through which the action of the issuing magistrate is viewed.  In <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213 (1983), the Court held that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of <u>de</u> <u>novo</u> review."  <u>Id.</u> at 236.  Rather, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts."  <u>Id.</u> (internal quotation marks omitted).  Thus, the issuing magistrate's decision should be reviewed to determine only that there was a "substantial basis for . . . [concluding] that a search would uncover evidence of wrongdoing."  <u>Id.</u> (omission and alteration in original) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>United States</u> v. <u>Ribeiro</u>, 397 F.3d 43, 48 (1st Cir. 2005) (using "substantial basis" analysis).  An aspect of this deference is that "[i]n a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause."  <u>United States</u> v. <u>Greenburg</u>, 410 F.3d 63, 67 (1st Cir. 2005) (quoting <u>United States</u> v. <u>Barnard</u> 299 F.3d 90, 92-93 (1st Cir. 2002)); <u>see</u> <u>also</u> <u>Gates</u>, 462 U.S. at 236 n.10.  There is a split of authority on whether, in a criminal case, deference to the decision of the issuing magistrate still applies when material portions of an affidavit are stricken for intentional misrepresentation or illegality.  <u>Compare</u> <u>United States</u> v. <u>Barajas-Avalos</u>, 377 F.3d 1040, 1058 (9th Cir. 2004) (de novo review), <u>and</u> <u>United States</u> v. <u>Elkins</u>, 300 F.3d 638, 651-52 (6th Cir. 2002) (same), <u>with</u> <u>United States</u> v. <u>Kirk</u>, 781 F.2d 1498, 1505-06 (11th Cir. 1986) (applying

question regarding Murray's first prong, we review the district court's conclusions of law de novo, and, giving the defendant the benefit here, we review the factual determination under a clear error standard.  The district court was in error.

A.    Probable Cause

We find that the affidavit still contained sufficient information to support probable cause to search the Quincy apartment even after striking from it all evidence found by the district court to either be untruthful or illegally obtained.

What concerned the district court was whether there was probable cause to search Dessesaure's apartment, as opposed to his car.  The court reasoned that just because a defendant is arrested dealing drugs from his car does not mean that there is probable cause to believe that the defendant's home would likely yield evidence connected with his drug dealing.  Dessesaure I, 314 F. Supp. 2d at 94.  The government in response talks about the inherent unlikelihood that the defendant would store valuable drugs in the car, or insert drugs into his rectum while in the car.  We need not analyze the district court's proposition, because here there was far more evidence for probable cause than simply the drugs found in Dessesaure's car and on his person.

_____

substantial basis test).  This circuit has never squarely confronted this issue, and the parties here do not address it. Giving the defendant the benefit of the rule favorable to him, arguendo, we do not rely on any presumption in favor of the issuing magistrate's determination.

The vehicle in which Dessesaure was traveling and apprehended was registered in his name at the address of the apartment searched. The police found traces of white powder, which, from their experience and observation, they thought (but did not test) to be heroin, on the garbage bags Dessesaure took to the trash from the apartment. When Dessesaure was arrested, the police testified, he tried to lead them down a false trail, denying that he lived where he did; a likely reason is that he had something to hide at the apartment. When Dessesaure picked up Boyd, Dessesaure had just come from his apartment, making it likely that the drugs he sold to Boyd came from the apartment. Dessesaure drove erratically as he returned under surveillance to his apartment. The affidavit stated that he drove this way to throw off anyone following him, again suggesting he had drugs in his apartment, a suggestion strengthened by his subsequent lies about where he lived. These facts were more than adequate to constitute probable cause. See United States v. Ribeiro, 397 F.3d 43, 48-52 (1st Cir. 2005) (finding sufficient "nexus" between activities described in warrant affidavit and defendant's residence to establish probable cause to search residence); United States v. Keene, 341 F.3d 78, 82 (1st Cir. 2003) (same); United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (same).

B.              Whether the Warrant Was Prompted by the Illegal Search

        We turn back to the first Murray prong, which requires
that 'the search pursuant to warrant was in fact a genuinely
independent source' and that the agents' decision to seek the
warrant not have been prompted by what the police observed during
the prior search.  Murray, 487 U.S. at 542.  As the Court wrote,
"to determine whether the warrant was independent of the illegal
entry, one must ask whether it would have been sought even if what
actually happened had not occurred."  Id. at 542 n.3.  The second
Murray prong, is, as we have held, wholly objective in its focus.
By contrast, as articulated by Murray in 1988, the first prong
appeared to be subjective: would these particular police officers
have sought the warrant even if they had not known, as a result of
the illegal search, that drugs were present in the apartment.  See
id., 487 U.S. at 542 n.3; Restrepo, 966 F.2d at 971-72.[9]  While the
first prong of Murray is articulated as a subjective test,
nonetheless, it should not be proven by purely subjective means.
In making the factual determination as to the police officers'
intent, the district court is not bound by after-the-fact
assurances of their intent, but instead must assess the totality of

_____

        [9] Since Murray, the Court has, without commenting on Murray's
first prong, eschewed use of subjective intent in certain Fourth
Amendment analyses as to whether there is probable cause to support
an arrest.  See Devenpeck v. Alford, 125 S.Ct. 588, 594 (2004);
Whren v. United States, 517 U.S. 806, 811-13 (1996).  We need not
determine today whether Whren and Devenpeck have affected the
subjective analysis mandated by the first prong of Murray.

                              -21-

the attendant circumstances to ascertain whether those assurances appear "implausible." Murray, 487 U.S. at 540 n.2; see Restrepo, 966 F.2d at 971-72; see also Devenpeck v. Alford, 125 S.Ct. 588, 594 (2004) ("Subjective intent of the arresting officer, however it is determined (and of course subjective intent is always determined by objective means) . . . .").

Applying the first prong of Murray, it is clear that objectively the officers were not prompted to seek the warrant by what they saw in the apartment. Significantly, Dessesaure and Officer Broderick both testified that Broderick informed Dessesaure at the station prior to the initial entry into the defendant's apartment that the police were going to apply for a search warrant. Indeed, the freezing of the apartment (whether done for exigent circumstances or not) was done on Broderick's way to get a warrant. Broderick left Dessesaure's apartment after spending only five or ten minutes there to go directly to the District Attorney's office and prepare a warrant application. Moreover, even if there had been no illegal entry into the apartment and the officers lacked knowledge that drugs were present there, there is no evidence to suggest that these officers would not have sought a warrant. Indeed, the absence of knowledge of the evidence viewed via the illegal access could only have encouraged them further to seek a warrant, as that would have been their only way to have sought out the evidence in the apartment they obviously suspected to exist and

desired to see.  The facts gathered legally, without resort to the facts gathered illegally, provided an independent and adequate source for the warrant application.

**IV.**

One other issue deserves comment.  Taking it as true that the officers lied (over the government's protest that this is an unfair characterization), the district court was understandably unhappy.  The record shows more than a touch of frustration and building tension.  At least some members of the Boston Police Department may have mistakenly believed that they were free, absent a search warrant or exigent circumstances, to enter a dwelling in order to "freeze" the scene.  The district court was quite correct to state strongly that this is not the law:

> There is no question that the police had no right to "freeze" the Quincy apartment where that meant entering it, looking around, searching, all the while ostensibly waiting for someone to get a warrant.  Nothing in First Circuit or Supreme Court case law remotely justifies such a step.  Nor should it.  Searching without a warrant, on the assumption that the magistrate will no doubt agree with the officers that there is probable cause to search that location at that time, makes a mockery of Fourth Amendment protection.  The warrant, and the review it requires, is reduced to a technicality.

Dessesaure I, 314 F. Supp. 2d at 92.

The allowance of the motion to suppress was error and is **reversed**.  The case is **remanded** to the district court for further proceedings consistent with this opinion.

-23-